# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 16-143-GW(AGRx) | Date | June 29, 2017 |
|---|---|---|---|
| Title | *Dexcowin Global, Inc. v. Aribex, Inc.* | | |

Present: The Honorable     GEORGE H. WU, UNITED STATES DISTRICT JUDGE

| Javier Gonzalez | Katie Thibodeaux | |
|---|---|---|
| Deputy Clerk | Court Reporter / Recorder | Tape No. |

Attorneys Present for Plaintiffs:

Andrew Y. Choung
Steven P. Basileo
Richard W. Buckner

Attorneys Present for Defendants:

Christopher S. Ruhland
Martin J. Black
Michael A. Fisher

PROCEEDINGS:     **MOTION FOR RECONSIDERATION BY DEXCOWIN GLOBAL, INC. AND DEXCOWIN CO. LTD. [170];**

**PRETRIAL CONFERENCE**

The Court's Tentative Ruling as to Dexcowin's Motion for Reconsideration is circulated. Court hears oral argument. For reasons stated on the record, Plaintiff's Motion is TAKEN UNDER SUBMISSION. Court to issue ruling.

Court and counsel confer re scheduling. The Jury Trial set for July 11, 2017, is ADVANCED to July 10, 2017 at 11:00 a.m.

The Court's Tentative Rulings as to Motions in Limine is circulated and attached hereto. Court hears argument and rules as follows:

Plaintiff Dexcowin Global, Inc. and Dexcowin Co. Ltd.'s Motions in Limine:
No. 1 to Preclude Aribex from Offering Irrelevant, Confusing, and Prejudicial Evidence or Testimony [184] is GRANTED IN PART and DENIED IN PART;
No. 2 to Preclude Aribex from Offering the Testimony of Scott Hadden [186] is DENIED;
No. 3 to Preclude Aribex from Offering the Testimony of Martin Hillman [187] is DENIED;
No. 4 to Exclude Certain Damages Testimony of Dr. Charles Mahla [207] is TAKEN UNDER SUBMISSION. Dr. Mahla will be deposed prior to trial with Defendants to pay costs;
No. 5 to Exclude the Expert Testimony of Dr. Steven Smith [208] is DENIED.

|  | 3 | : | 50 |
|---|---|---|---|
| Initials of Preparer | JG | | |

# UNITED STATES DISTRICT COURT
# CENTRAL DISTRICT OF CALIFORNIA

## CIVIL MINUTES - GENERAL

| Case No. | CV 16-143-GW(AGRx) | Date | June 29, 2017 |
|---|---|---|---|
| Title | *Dexcowin Global, Inc. v. Aribex, Inc.* | | |

Defendant/Counter-claimant Aribex's Motions in Limine:

No. 1 to Exclude Testimony of Deung Ro-lee and Any Other Evidence on Product Development [176] is continued to July 3, 2017.  Copies of documents will be produced by noon on June 30, 2017;

No. 2 to Exclude Reference to IMS2000 [177] is continued to July 3, 2017.  Copies of documents will be produced by noon on June 30, 2017;

No. 3 to Exclude Testimony of James Archer and Brent Bigler [178] is DENIED;

No. 4 to Preclude Newly Identified Witness Brian Min from Testifying [179] is DENIED;

No. 5 to Exclude Evidence of Aribex Settlement Offers under Rules 402 and 408 [212] is DENIED;

No. 6 to Exclude Evidence of Aribex and Danaher's Size, Wealth, and Overall Revenues, and Corporate Relationship [182] is GRANTED;

No. 7 to Exclude Opinions and Testimony of Dexcowin Damages Expert Philip Blum under Daubert [214] is continued to July 3, 2017;

No. 8 to Exclude Evidence and Testimony of Battery Recall [183] is GRANTED IN PART;

No. 9 to Preclude Warren S. Grundfest on Certain Invalidity and Non-Infringement Issues [215] is continued to July 3, 2017.

The Pretrial Conference is continued to July 3, 2017 at 9:00 a.m.  Parties may appear telephonically provided notice is given to the clerk.

|  | 3 | : | 50 |
|---|---|---|---|
| Initials of Preparer | JG | | |

*Dexcowin Global, Inc. v. Aribex, Inc.*, Case No. CV-16-0143- GW-(AGRx)
Tentative Rulings on Motions in Limine

## INTRODUCTION

Dexcowin Global, Inc. ("Plaintiff") brought this action of patent noninfringement and invalidity against Aribex, Inc. ("Defendant" or "Aribex"). The Asserted Patents involve portable x-ray devices. Plaintiff seeks declaratory judgment that its products do not infringe U.S. Patent Nos. 7,224,769 ("the '769 patent") and 7,496,179 ("the '178 patent") (collectively, "Asserted Patents"). Dkt. No. 1 at ¶2. It also seeks declaratory judgment that one or both of the Asserted Patents are invalid. Dkt. No. 1 at ¶3. Aribex filed counterclaims against Dexcowin Global and Dexcowin Korea (collectively, "Dexcowin"), alleging direct, indirect and contributory infringement of the Asserted Patents. Dkt. No. 13 at ¶¶84-87, 99-104.

Trial is set for Tuesday, July 11, 2017. Plaintiff filed 5 motions in limine. Defendants filed 9.

## ANALYSIS

### 1.    PLAINTIFF'S MOTIONS IN LIMINE

#### 1.1    Plaintiff's MIL #1 to preclude Aribex from offering irrelevant, confusing, and prejudicial evidence or testimony

##### 1.1.1   *Summary of Plaintiff's Motion and Reply* (Dkt. No. 184, 247)

Aribex has characterized Dexcowin as a Chinese company whose products are counterfeits. Any similarity in design between Dexcowin products and Aribex's products is not relevant to the infringement issues of the Asserted Patents, which are utility patents. Labelling Dexcowin as a counterfeiter or characterizing it as a foreign company for the purpose of improper stereotypes has no probative value and would only inflame, confuse, and prejudice the jury.

Aribex seeks to introduce evidence of radiation tests on Dexcowin's products to imply that they are unsafe. This should be excluded as irrelevant and unduly prejudicial. Neither of Aribex's experts are qualified to testify about safety or radiation testing, and lay witnesses cannot provide anything other than improper lay opinion.

Aribex should be precluded from introducing evidence that the Patent Trial and Appeal Board ("PTAB") denied the request to institute an Inter Partes Review ("IPR") of the Asserted Patents. There is a different standard for PTAB and the denial of institution was on grounds different from those that will be presented at trial. The denial should be

1

excluded as irrelevant, especially because a jury is likely to give undue weight to decision by a judicial or administrative body.  Similarly, Aribex should not be allowed to argue that the IPR or EPR show that Dexcowin failed to invalidate the patents or that PTAB has rejected the invalidity issues in this case.

[*Reply:*] Dexcowin did not object to the factual point that it is a Korean company but objects to improper characterizations.  There has never been any allegation or evidence that Dexcowin has copied Aribex, so the argument that such evidence is relevant to secondary considerations lacks force.

Aribex fails to explain how radiation testing risks prejudicing state regulators whose decisions are based on approval requirements.  Rather, it seeks to introduce this evidence solely to insinuate that Dexcowin's products are of lower quality.  It has not disclosed any expert who could opine on PTO proceedings.  There is no probative value of the issuance of the EPR certificate, and Aribex should be precluded from referring to the IPR or EPR for purpose of characterizing that Dexcowin has failed to invalidate the patents or insinuating that the PTO has already rejected the invalidity issues in this case.

### 1.1.2  *Summary of Defendant's Opposition* (Dkt. No. 222)

Dexcowin's motion is overbroad and does not provide a clear, objective standard for implementation at trial.

Dexcowin products are made in Korea and some of the witnesses will testify in Korean; it will be impossible to avoid mentioning Korea at trial.  Being a Korean company is relevant because of the territoriality requirements of patent law, and it is the importation of the accused products which infringes the Asserted Patents.  Also, evidence of copying is relevant to secondary considerations of nonobviousness and will not necessarily lead the jury to conclude that Dexcowin is a counterfeiter.  Aribex has not attempted to cast Defendant as a counterfeiter.

The radiation tests would be used to show that Dexcowin's lower-quality devices risks prejudicing state regulators against all such products.  This is relevant to Aribex's request for injunctive relief because monetary damages cannot compensate the damage to its reputation.  Dexcowin seeks a blanket exclusion of relevant evidence of quality, not safety.

The denials of IPR are relevant to show that Dexcowin willfully infringed: after failing twice, it could not have had a good faith belief in the invalidity of the Asserted Patents.  The Asserted Patents have a presumption of validity and the rejected post-grant reviews are consistent with that presumption.  Dexcowin also seeks to exclude the reexamination, but this is a part of the file history just like the original prosecution. Some of the asserted claims were issued from reexamination.  The reexamination certificate notes what prior art was reviewed during the full examination process.  It's unclear what relief Dexcowin requests with respect to reexamination.

### 1.1.3  *Tentative Ruling*: **GRANT in part, DENY in part**

2

Safety: Dexcowin seeks to exclude evidence that its products are unsafe or unregulated. It points specifically to radiation tests: Aribex's only argument is that this is relevant to injunctive relief, which isn't a question for the jury.   There is no factual dispute about the radiation tests for the jury to decide, so the motion is **granted** with respect to the radiation tests.  However, Aribex's expert Mahla opines that safety of minor suppliers is less well known or verifiable, a fact relevant to his lost profits analysis.  Dkt. 86-26 at ¶39.  Because the safety of the products is relevant, Dexcowin's broad request to exclude any reference of safety or regulation is **denied**.  A limiting instruction can cure any potential prejudice that the jury will decide based on whether or not they think a product is safe.

The denial is without prejudice; Dexcowin can raise objections to specific evidence at trial and the Court can rule based on the context.  The motion is also denied without prejudice with respect to the following evidence.

Foreign company for improper purposes: Aribex's expert Mahla quotes a source that refers to Chinese machines, but it's not clear that they are Dexcowin's products.  Dkt. 86-26 at 23, n. 80.  Without any other specific examples, it is unclear what Dexcowin deems to be an improper purpose.

Copying: Dexcowin cites a different Aribex motion, which says: "While the general public certainly enjoys lower prices, cheap copies of patented inventions have the effect of inhibiting innovation and incentive."  Dkt. No. 105 at 24.  This is a reference to copying and pricing, which are relevant to secondary considerations of obviousness and to lost profits, rather than an improper characterization.  There are no other specific examples, so it is unclear what Dexcowin deems to be a pejorative characterization.

PTAB decisions: Case law supports exclusion of pending IPR proceedings, but Dexcowin seeks to exclude PTAB decisions.  Denial to institute IPR has different legal standards but "any potential confusion can be addressed by appropriate jury instructions on the standard of proof applicable to patent invalidity defenses and counterclaims."  *Universal Elecs., Inc. v. Universal Remote Control, Inc.,* No. SACV 12-0329-AG (JPRx), 2014 WL 8096334, at *7 (C.D. Cal. 2014).

## 1.2     Plaintiff's MIL #2 to preclude Aribex from offering the testimony of Scott Hadden

### 1.2.1   *Summary of Plaintiff's Motion and Reply* (Dkt. No. 186, 249)

Aribex disclosed Scott Hadden as a potential witness who would testify to the (1) design, development, operation, technical features, and testing of its NOMAD line of

products, and (2) inspection, testing, and technical features of the accused products. He lacks personal knowledge to testify to any of these topics.

He lacks an electronic background and admitted that he could not testify to the power circuitry, operation, electrical current, internal circuitry, or any other technical or design aspects of the NOMAD line. He only generically claimed that he was assigned to bring the product to market and could not articulate his specific involvement or personal knowledge regarding the product development. He was not personally involved with the testing of the line and was unaware of anyone else at Aribex who had performed such testing.

He did not know what the accused products were, so he cannot testify about the inspection, testing, or technical features of the accused products. He should also be precluded from testifying as to design, development, operation, and technical features of the NOMAD Pro 2 because he failed to provide substantive testimony on the topic and was evasive at the deposition.

His testimony would be duplicative of Aribex's 30(b)(6) witness, Brad Carlson. If Hadden is permitted to testify to any topics of which he has personal knowledge, the Court should require Aribex to provide this testimony before calling him as a witness.

*[Reply]:* Aribex now argues that Mr. Hadden should be allowed to preoffer his "remaining testimony." However, this remaining testimony is a mystery. Moreover, Dexcowin cited over 40 instances in Mr. Hadden's deposition where he refused to answer questions or disclaimed knowledge of the subject matter. He is an inexperienced person who did not complete any of the design or development; he would only be giving a lay opinion on a highly technical matter. Generating one slide does not qualify him to testify to all of the NOMAD products. Moreover, Mr. Hadden admits through his deposition that he did not know or conduct the testing himself.

### 1.2.2   *Summary of Defendant's Opposition* (Dkt. No. 220)

Hadden has personal knowledge of Aribex's product and business, including the NOMAD line. Hadden has been a Product Manager at Aribex for 5 years. He testified that he is responsible for the NOMAD 75Kv and NOMAD MD product line and that he manages the distributors for the NOMAD PRO 2 and Veterinary product lines. He manages the development and marketing of handheld x-ray devices and assists engineering of new devices. To the extent that Dexcowin didn't seek his testimony as to other matters concerning NOMAD line, personal knowledge can be inferred from his position at Aribex. Similarly, Hadden testified as to his personal knowledge of the development and testing of the NOMAD line.

He stated that he has personal knowledge of Dexcowin's products. To the extent that Hadden's personal knowledge of particular Dexcowin products is not in the transcript, it was Dexcowin's prerogative, though it can cross-examine him on the subject if it so chooses.

4

Aribex will not seek to introduce Hadden's testimony about the power circuitry, how the x-ray source works, or how the electrical current works of the NOMAD products.  He will also not testify as to the technical details of the internal circuitry, battery, or display of the NOMAD Dental and NOMAD PRO 2.  These issues raised by Dexcowin are consequently mooted.

### 1.2.3   *Tentative Ruling*: **DENY**

The requirement of personal knowledge is a minimal burden on a witness; if reasonable persons could differ as to whether a witness had adequate opportunity to observe, the testimony is admissible.  *Strong v. Valdez Fine Foods*, 724 F.3d 1042 (9th Cir. 2013). Aribex has pointed to specific testimony to show that Hadden has personal knowledge of the NOMAD line and of the Accused Products to meet this minimal burden.  Dexcowin can cross-examine to test his credibility.  However, Hadden will not be allowed to testify as to any topic where he improperly refused to answer a question during his deposition or disclaimed knowledge of the subject matter.[1]

## 1.3    Plaintiff's MIL #3 to preclude Aribex from offering the testimony of Martin Hillman

### 1.3.1   *Summary of Plaintiff's Motion and Reply* (Dkt. No. 187, 249)

Martin Hillman, Product Manager at Aribex, was identified as a witness to the sales and marketing of the NOMAD line and accused products. His testimony would be duplicative of Aribex's 30(b)(6) witness, Jeffrey Kappler.

He lacks personal knowledge and cannot testify to these topics. He admitted he had "no experience or knowledge or would not be a product expert at all" about the accused products. Throughout his deposition, Hillman made clear that he did not have information about the sales and marketing of NOMAD line. He does not interact with any of the distributors or sales to end users. Hillman also admitted that he could not testify to the accuracy of marketing brochures or studies of the NOMAD line. Therefore, any testimony on these topics would be pure speculation, which is substantially more prejudicial than probative. If he is permitted to testify, the scope should be limited to topics of which he has personal knowledge.

[Reply]: During his deposition, Mr. Hillman himself said his contribution was disclosed "to be minimal, to level of no value." Aribex's argument that personal knowledge may be inferred from Mr. Hillman's position as product manager is insufficient.

After Dexcowin's counsel went through a sequence of questioning, Mr. Hillman consistently testified that he had no knowledge of the sales and marketing documents.  In

---

[1] The Court notes, however, that in many instances where Dexcowin claimed that Hadden had refused to answer a question or disclaimed any knowledge of particular subject matter, the problem was actually with the way the question was phrased and not with the reponse.

his deposition, Mr. Hillman clarified that his personal knowledge is only limited to labeling and associated documentation of that labeling.

### 1.3.2   *Summary of Defendant's Opposition* (Dkt. No. 221)

Hillman has been a Product Manager at Aribex for 5 years.  He testified as to the following.  He oversees the Dental and Veterinarian products, including NOMAD Dental, NOMAD Pro, and NOMAD PRO 2.  He interacts with potential customers at trade shows and dealers who distribute the products.  He explained that internationally, NOMAD is sold to independent dealers and domestically to four particular distributors.  He can testify about the marketing efforts against competing devices.  He never disclaimed personal knowledge but only stated that he was not a product expert.

Hillman will not be proffered to testify as to the following: sales and marketing of Dexcowin's products, activities by distributors to sell the NOMAD line, Kavo Kerr's licensing practices, whether specific statements in marketing brochures were accurate, whether the contents of product labelling on NOMAD is accurate, go-to market plans for NOMAD, and product value propositions for NOMAD. These issues raised by Dexcowin are therefore mooted.

### 1.3.3   *Tentative Ruling*: **DENY**

The disputed topics are the sales and marketing of the NOMAD line. Aribex has pointed to specific testimony to show that Hillman has personal knowledge to meet the minimal burden.

## 1.4   **Plaintiff's MIL #4 to   exclude certain damages testimony of Dr. Charles Mahla**

### 1.4.1   *Summary of Plaintiff's Motion and Reply* (Dkt. No. 207, 249)

Dr. Charles Mahla's reasonable royalty and lost profits opinions should be excluded as unreliable.

Reasonable royalty

Mahla uses the wrong date for the hypothetical negotiation. If Dexcowin's DX3000 infringes the Asserted Patents, that infringement began no later than 2009 when Dexcowin first sold it in U.S. Mahla incorrectly uses "early 2010" as the hypothetical pre-infringement negotiation date.

Mahla does not consider actual licenses that are relevant to the *Georgia-Pacific* analysis. When Aribex first accused Dexcowin of infringement in 2009, it offered to license the patents at royalty rate of 5% (or $150 per unit).  This offer shows what royalty Aribex was willing to accept, which would thus be the upper limit for a reasonable royalty rate.  Instead, Mahla opines that reasonable royalty would be $1,900/unit, which

is more than 76% of the average selling price of Dexcowin's products between 2010 and 2016.  He assumes that Aribex had a policy of not licensing its patents, but this ignores Aribex's offer to license Dexcowin and other third parties.

[*Reply:*] The circumstances in 2008 were different from those in 2010, such as the fact that Aribex did not have a policy of refusing to license its patents.  In 2009, Aribex offered to license its patents to Dexcowin, which contradicts the assumption about its policy in 2008.

Lost profits

For *Panduit* factor 1 (demand for the patented feature), Mahla is conclusory, stating that (1) the patented features are the devices themselves and (2) that demand exists because the devices were sold.  The first statement is not his opinion but his understanding after consulting Aribex's technical expert and other evidence.  Mahla cannot establish *Panduit* factor 1 by relying on someone else who does not have the requisite expertise.  Smith's statement that the NOMAD products embody the patented feature is unreliable: they only meet the '769 patent's claim limitations when used by a customer with additional components.  If the NOMAD products do not embody all of the patented features, then demand for them cannot equate to demand for the patented features.  As to the second statement, he cannot establish a link between any specific evidence of customer demand (such as surveys) and intrinsic value of the patented feature. Aribex's own documents show that customer demand is based on non-patented features such as long battery life, clear x-ray images, and modern radiation shielding; Clark Turner admits that primary reason driving demand was the cost of the device.

For the second factor (acceptable non-infringing substitutes), Mahla inappropriately excludes wall-mounted x-ray devices and portable x-ray devices with external batteries from the 'but for' market.  Aribex and its expert have admitted that these are noninfringing and acceptable to dentists, yet Mahla excludes them as irrelevant. Limiting the 'but for' market to only the claimed invention would always result in an absence of non-infringing substitutes.  Aribex's own study shows that instead of a NOMAD, customers would purchase the wall-mounted device or Dexcowin's portable device with external batteries.  Mahla speculates without evidence that the NOMAD is superior to these; superiority is irrelevant to the question of acceptability.

[*Reply:*] Emphasizes that *Panduit* factor 1 requires demand for the patented features and that evidence supports that the wall-mount and portable devices with external batteries were acceptable, noninfringing alternatives.

### 1.4.2   *Summary of Defendant's Opposition* (Dkt. No. 219)

Reasonable royalty

Mahla uses evidence provided by Dexcowin to establish that the first sale of an accused product occurred in early 2010. When he was presented with other evidence, Mahla

concluded that an earlier date would not affect his calculations. (Decl. of Charles Mahla,
Dkt. No. 219-1.)

The 2009 offer is an incomplete, unilateral opening proposal full of variables for a
joint development deal, and Dexcowin interprets it to be the most probative evidence of a
reasonable royalty.  Based on the Court's MSJ ruling that the offer is not conclusive on
the question of reasonable royalty, Mahla's testimony cannot be excluded just because he
doesn't view it the same way Dexcowin does.  Dexcowin argues that the $1900/unit
royalty is astronomical compared to its historical prices, but a reasonable royalty can be
based on patentee's profits and an infringer's selling price can be raised to accommodate
a reasonable royalty.

Lost profits

*Panduit* factor 1 requires showing of demand for the patented product, not of
patented features.  The Court already ruled in its summary judgment order that Mahla
properly relied on Smith and other evidence to conclude that *Panduit* factor 1 was
established.

Dexcowin claims that Mahla cannot opine that *Panduit* factor 2 has been met
because it disputes his opinion that wall-mounted x-ray devices and handheld units with
external batteries are not acceptable, noninfringing alternatives.  At most, this raises a
factual dispute.  Mahla supports his opinion based on evidence of Dexcowin's initial
choice to make and promote cordless internal battery units, low sales of external battery
devices, shipments of internal replacement batteries, and its opinion that the external
batteries were a nuisance in handheld mode.  He also cites evidence that the handheld x-
ray market was the relevant market: cordless, handheld devices embodying the patented
features were significant advance over wall-mounted devices because they offered greater
treatment flexibility and control, enhanced workflow, time savings, and economic
advantages.   Mere existence of a few Dexcowin external battery sales mistakes
noninfringement with acceptable noninfringement.

### 1.4.3   *Tentative Ruling*: **DENY**

Mahla explains that even if the hypothetical negotiation occurred at an earlier date,
applying the principles used in his original analysis would yield the same result.  Decl. of
Charles Mahla, Dkt. No. 219-3 at ¶8.  Also, just because Mahla disagrees that it is an
actual license doesn't make his opinion unreliable. Dexcowin can cross-x Mahla to
discredit him.

Mahla can rely on the other evidence and Smith's opinion to conclude that this
*Panduit* factor 1 is established. Dexcowin doesn't raise any issues to disqualify Mahla's
analysis of demand for the patented product (the first factor is not demand for the
patented features).  Panduit factor 2: jury can decide based on the testimony whether the
wall-mount and portable devices with external batteries are non-infringing acceptable
alternatives.

### 1.5    Plaintiff's MIL #5 to exclude the expert testimony of Dr. Steven Smith

#### 1.5.1   *Summary of Plaintiff's Motion and Reply* (Dkt. No. 208, 249)

Dr. Steven Smith does not have the relevant experience to testify as to 'motivation to combine.' He claims that the x-ray field is divided into various subspecialties and that a person of ordinary skill in the art ("POSITA") in one subspecialty cannot be assumed to use the knowledge/technique of another.  Even though x-ray devices used to analyze chemical composition contain most of the Asserted Claims, Smith deems them irrelevant because they are not medical imaging devices.  Smith claims that these devices are used in completely different ways for fundamentally different purposes and problems by customers in unrelated industries. Similarly, he claims that x-ray security devices are not relevant.

By his own assertions, Smith's background in security companies working on bomb detection devices is irrelevant to the subspecialty at issue here.  He also lacks experience with medical x-ray imaging and has never designed a dental or medical x-ray device.  He has no way of knowing what a designer of portable medical x-ray device in 2003 would think or do. Thus, he is not qualified to opine on that subject.

If he is qualified, his opinion as to lack of motivation to combine must be precluded because it contradicts the assumption on which his qualification is based.

[*Reply*:] Smith repeats at least 18 times that the subspecialties are distinct and the devices in medical and security fields are used for different purposes and problems by different customers in unrelated industries.  Dexcowin did not artificially narrow the relevant field, as Aribex claims, but Smith did.  If the relevant field is narrowly focused on portable medical devices, then Smith's opinion is unreliable.  If his opinion is not excluded, Dexcowin requests that judicial notice be taken of Aribex's position that the relevant art includes all x-ray devices, regardless of subspecialty.

Smith has never designed or developed a dental x-ray device or a portable x-ray device.  If, as Aribex claims, Smith's general experience in the medical device industry renders him qualified, then the general x-ray imaging devices must be relevant.  Smith's opinion that a POSITA would not borrow technologies from such devices is unreliable.

#### 1.5.2   *Summary of Defendant's Opposition* (Dkt. No. 218)

Smith is qualified according to the Court's definition of a POSITA: he has a Bachelor's and Master's degrees in physics and physics instrumentation, Ph.D. in EE, and 30 years of experience in x-ray imaging devices.

Smith has recently spent more time on security x-rays rather than medical x-rays. Dexcowin tries to use this to say that he must not be qualified to testify about medical x-rays, but Smith has experience in medical x-rays.  He has a Ph.D. focused on medical imaging devices, that he was a director of research on medical x-ray devices, and that he continues to evaluate medical x-ray devices as part of his consulting work.

Dexcowin also argues that if Smith is qualified, he must be precluded from using the differences in the two subspecialties as a factor in his non-obviousness opinion.

9

Dexcowin conflates the standards for expert qualification with those of patent obviousness. To prove obviousness, Dexcowin must show that each claim element appears in at least one reference and that a POSITA would have considered the concepts from the references to be obvious to combine. Smith was using different industries and applications as one of several factors weighing against obviousness of combining several pieces of prior art. "It would not have been obvious to combine medical imaging devices … with security and industrial inspection devices … [because] they are for entirely different purposes, solve unrelated problems, and sold in different industries…" He was not saying that references from different x-ray subspecialties cannot be combined.

### 1.5.3   *Tentative Ruling*: **DENY**

Smith is qualified as a POSITA. His testimony is that it would not have been obvious to combine the references from the two subspecialties. This does not conflict with the fact that a person can be knowledgeable to speak about the two subspecialties. Dexcowin suggests that Smith claims the devices in one subspecialty are irrelevant to another, but his report is saying that it would not have been obvious to combine them (*i.e.*, they could still be relevant prior art).

## 2   DEFENDANT'S MOTIONS IN LIMINE

### 2.1   Defendant's MIL #1 to exclude Lee testimony

#### 2.1.1   *Summary of Defendant's Motion* (Dkt. No. 176, 237)

Deung Ro-Lee is a Korean resident and former Director of R&D at Dexcowin. He is offered as a fact witness to testify on issues of (1) motivation to combine, (2) development of IMS2000 sold by InnerMax, and (3) development of DX3000.

IMS2000 and DX3000 are irrelevant to the validity of Asserted Patents. Dexcowin concedes that IMS2000 is not prior art. DX3000 is not prior art because there is no evidence that the product was sold in the U.S. prior to the critical date. He offers a patent application that he opines is similar to the IMS2000, but that is not prior art under US patent law. The remaining documents regarding these two products were not identified as prior art in Dexcowin's invalidity contentions, and Dexcowin's expert did not chart them against the patent claims.

Moreover, Lee cannot testify on 'motivation to combine' because it is expert opinion but Lee was not disclosed as an expert. Dexcowin cannot skirt expert disclosure requirements by offering lay opinion testimony based on scientific or technical knowledge. Dexcowin seeks to use a fact witness to argue obviousness based on Lee's real world examples of POSITA who were motivated to combine well-known elements. Such expert testimony cannot be offered through a fact witness. Lee's anecdotal evidence of how he might have combined non-prior art devices is irrelevant.

[*Reply*] Dexcowin claims that the IMS2000 and DX3000 devices and "documentation
associated with those devices" (which were not identified in Dexcowin's invalidity
contentions) are prior art references without actually establishing that they meet the
definition of prior art other than stating that they existed before the priority date of the
claimed invention.   The documents are in Korean and are not prior art because the
devices were not sold at least a year before the priority dates of the patents.  Regarding
the devices, the IMS2000 was never sold in the US and the first US sale of the DX3000
was in 2010, well after the filing date of the patents-in-suit.  Nor were the devices in
public use in the US more than one year prior to the filing date of the patents-in-suit.
Because the devices are not prior art, any fact testimony about the characteristics of the
devices or how they operated is irrelevant.  Also, Dexcowin has failed to meet 35 U.S.C.
§ 282(c), which requires that they serve a list of prior art references to be asserted at trial
at least 30 days before trial.

Lastly, allowing Mr. Lee to testify about "prior art" and "invalidity" when the
subject of his testimony is not prior art and is irrelevant to the issue of validity will only
confuse the jury.

### 2.1.2   *Summary of Plaintiff's Opposition* (Dkt. No. 223)

Lee is offered as a direct percipient witness with factual knowledge about *his own*
efforts to develop the IMS2000 and DX3000.  He was a practicing engineer in the field of
x-ray devices in 2003 and Dexcowin's chief engineer from 2004 to 2009.

Dexcowin didn't admit that IMS2000 is not prior art.  The IMS2000 and DX3000
were sold in Korea, so they do not constitute as an on-sale bar under 35 U.S.C. 102(b).
However, the devices and the associated manual and device specification were publicly
available before the priority date of the claimed inventions.  Therefore, they are prior art
under 102(a).  This material was also produced well in advance during discovery; Aribex
does not specifically identify or move against any of these items of evidence.  Lee can
testify about the documents he prepared, the content distributed, and his direct, first-hand
efforts in designing and developing the DX3000 and IMS2000.  This is factual testimony,
not expert testimony.

### 2.1.3   *Tentative Ruling*: **DENY**

Lee may testify on topics of which he has personal knowledge, such as the
development of the IMS2000 and DX3000. He may not give his opinion about whether
the device is a simultaneous invention.

## 2.2    **Defendant's MIL #2 to exclude IMS2000**

### 2.2.1   *Summary of Defendant's Motion* (Dkt. No. 177, 238)

11

IMS2000 is an x-ray device sold by InnerMax Co., Ltd. in Korea, but by Dexcowin's admission, it is not prior art.  Therefore, it is irrelevant to the obviousness analysis.

Dexcowin seeks to present the IMS2000 and assert that it was developed before or at the same time as Aribex's inventions.  However, it is not a simultaneous invention relevant to obviousness arguments because the IMS2000 does not meet each and every limitation of the claimed invention.  "High current load sufficient for radiographic imaging" has been construed to mean "greater than about 2 mA" and is in all of the asserted claims of the '178 patent.  IMS2000 operates at 1 mA, so it fails to meet the limitation.  Also, all of the asserted claims of the '769 patent claim a 'display means comprising an LCD screen integrated into the housing.'  IMS2000 lacks an LCD screen, so it fails to meet this limitation as a matter of law.

Also, there is no competent expert opinion that provides a claim-by-claim analysis showing IMS2000 was a simultaneous invention.  Dexcowin's expert didn't use the correct legal standard because he said it was a similar product, but simultaneous invention must be the 'identical invention.'  Minimal relevance and is outweighed by unfair prejudice and jury confusion by injecting a legally irrelevant X-ray device into the case.

[*Reply*] Dexcowin also somehow interpreted Aribex's motion to suggest that Aribex concedes that the IMS2000 is relevant to the issue of simultaneous invention.  In fact, Aribex's motion asserts that the IMS20000 is irrelevant because it is *not* a simultaneous invention.

Lastly, Dexcowin's suggestion that Aribex has disclaimed infringement of devices with OLED screens reflects Dexcowin's misunderstanding of the law regarding the Doctrine of Equivalents.  Simultaneous invention exists as a narrow category of art that is not prior art, but is nonetheless probative of obviousness.  However, simultaneous invention is one that is "identical" to the asserted invention and, therefore, must satisfy each and every claim limitation.  By contrast, a patentee can prove infringement either literally, or under the DOE; therefore, pointing out that the IMS2000 does not literally satisfy the claim elements does not act as estoppel from for the purposes of infringement.

### 2.2.2  *Summary of Plaintiff's Opposition* (Dkt. No. 223)

Aribex is improperly seeking summary judgment the obviousness issues of motivation and secondary considerations.  The IMS2000 (and DX3000) and associated documentation existed before the priority date of the '769 patent, so they are prior art references.  As Aribex admits, this device goes to the issue of simultaneous invention, which is relevant to obviousness.  Whether or not Dexcowin can show the IMS2000 is actually a simultaneous invention goes to the weight, not admissibility of evidence.

Also, Aribex necessarily disclaimed any claim of infringement against accused products with an LED screen.  It cannot distinguish between the LCD screen in the

claimed invention and the LED indicator of the IMS2000 to avoid obviousness, but then claim an LED is equivalent for the purposes of infringement.

### 2.2.3  *Tentative Ruling*: **DENY**

Whether or not the IMS2000 is a simultaneous invention is relevant to the issue of obviousness of the '769 patent.  The jury can decide whether Dexcowin has proven this, but there are no 403 dangers to warrant exclusion of the device.

## 2.3    Defendant's MIL #3 to exclude testimony of Archer and Bigler

### 2.3.1  *Summary of Defendant's Motion and Reply* (Dkt. No. 178, 239)

James Archer is the CEO of Archer Dental, and Brent Bigler is the President of Vector R&D.  They were disclosed as having information on the x-ray devices, prior art and prior sales, industry and market for x-ray devices.   Aribex served document subpoenas on their companies, but they served broad objections to the subpoenas, refusing to produce any documents.   They are not mentioned in Dexcowin's Memorandum of Contentions of Fact and Law or by either of Dexcowin's experts. Dexcowin hasn't identified the relevance of their testimony.

Archer and Bigler run companies that are U.S. distributors of the accused X-ray devices.  Archer has sued Aribex's parent company for antitrust violation, and Dexcowin only wants to call these individuals to criticize Aribex.  They have no testimony on facts relevant to this case.  Even if they were to testify about the accused devices, this would be a waste of time and cumulative to Raymond Ryu's testimony.  Ryu is the President of Dexcowin and was identified by Dexcowin as the person most knowledgeable on the x-ray devices, their features, sales, and marketing.

[Reply]:  Dexcowin does not provide any information to the contrary including documents, declarations, or testimony to show the witnesses would have relevant evidence.  Instead, Dexcowin says that Mr. Archer and Vector Research are a source of evidence for the market of hand-held X-ray devices.  However, this is vague and not sufficient. Dexcowin ignored the FRE 403 issues: unfair prejudice (the witness have animosity toward Aribex), cumulative evidence, and wasteful presentation [Dexcowin previously listed over 800 documents on its exhibit list and would like to call witnesses (some which would require an English/Korean translator).]

Finally, Dexcowin should cross-examine Bigler and Archer in order to defend itself.  Both witnesses have sordid histories. Bigler is a convicted felon and served time in federal prison.  Previously, Bigler used his position as a president of a dental supply company to defraud Dentsply (one of the largest dental suppliers in the world) out of over two million dollars.  Moreover, Bigler's business associate Archer, incorporated a shell company that Bigler used to funnel illegal payments to criminals.  Archer also admitted his partnership received a large unsecured loan from Mr. Bigler's illicit shell company.

13

Because no one can explain why these two should testify, the Court should apply FRE Rule 403 to exclude them.

### 2.3.2   *Summary of Plaintiff's Opposition* (Dkt. No. 224)

Archer Dental and Vector R&D are distributors of dental equipment.  Archer and Bigler are sources of evidence on the market for hand-held x-ray devices, customer demand, competing products, sales and distribution channels.   These topics go to the issues of monetary damages and injunction.  They were properly disclosed in initial and supplemental disclosures.   Aribex identified them in its own disclosures, served subpoenas on them to take their depositions, and voluntarily cancelled their depositions before Archer and Vector could respond. In an abundance of caution, Archer and Vector served their objections to the subpoenas to preserve their position.  They also offered to meet and confer with Aribex about reasonable timing and scope of document production and depositions; thus, they were available for deposition but Aribex failed to respond.

Aribex claims that these witnesses are not fans of Aribex, but that is irrelevant. They are competitors, but that does not mean they are inherently unreliable.  Aribex seeks to exclude highly probative evidence because it failed to depose them.

### 2.3.3   *Tentative Ruling*: **DENY**

The witnesses were properly disclosed, and Dexcowin identifies relevant topics of their testimony.  Aribex can cross examine the witnesses.  The relevance of their testimony is not substantially outweighed by prejudice as a competitor to warrant exclusion.

## 2.4     **Defendant's MIL #4 to preclude Brian Min**

### 2.4.1   *Summary of Defendant's Motion and Reply* (Dkt. No. 179, 241)

Duk-Chul Brian Min is a Dexcowin employee and will apparently testify to the development of Dexcowin's products.  Co-pending motions address the irrelevance of this evidence, but Min should be precluded because he was not identified in initial or amended disclosures under FRCP 26(a)(1).  Aribex has been severely prejudiced; it only learned of the existence of Min in the middle of a 30(b)(6) deposition on February 27, 2017, but did not know that he was a potential trial witness.  On May 22, 2017, Dexcowin disclosed intention to bring Min to trial, but fact discovery and expert discovery closed on March 17 and April 21, respectively. Under FRCP 37(c)(1), Dexcowin's failure to disclose Min as a trial witness precludes it from calling him at trial.

*[Reply]:* At a minimum, Dexcowin should be required to disclose what Mr. Min will testify to at trial and to depose when he comes to the United States for trial.

By identifying Mr. Min in October and then not identifying him in January, Dexcowin communicated to Aribex that it had no intention of calling Mr. Min at trial.

Previously, Dexcowin designated Mr. Ryu to testify on this technical specifications rather than Mr. Min. At some point after discovery had closed, Dexcowin had changed its mind and refused to produce a deposition before trial. Dexcowin is trying to win a tactical advantage by violating its FRCP 26 obligations and forcing Aribex to cross-examine a technical witness, who is testifying in Korean without a deposition. Dexcowin will not be prejudiced if Mr. Min does not testify because Mr. Ryu will testify at trial, and Mr. Ryu was the 30(b)(6) witness on the topics Mr. Min will cover.

### 2.4.2  *Summary of Plaintiff's Opposition* (Dkt. No. 225)

On October 7, 2016, Dexcowin disclosed Min in response to Aribex's interrogatory as a potential witness knowledgeable about the design, configuration, operation, etc. of the accused products. Under FRCP 26(e), Dexcowin has met its disclosure obligations. Aribex could have deposed Min, but chose not to.

### 2.4.3  *Tentative Ruling*: **DENY**—the witness was properly disclosed.

## 2.5  Defendant's MIL #5 to exclude evidence of Aribex Settlement Offers under Rules 402 and 408

### 2.5.1  *Summary of Defendant's Motion and Reply* (Dkt. No. 212, 254)

Dexcowin began selling the Accused Products in the U.S. in 2008. In February 2009, Aribex sent a cease-and-desist letter and threatened to file a patent infringement action if Dexcowin did not halt its sales. In a series of letters in May 2009, the parties attempted to resolve the dispute with a settlement. Aribex proposed five year license and Dexcowin would provide unspecified future design, engineering, and development services for a new Aribex device at 5% royalty; the provisions were to offset each other and no money would change hands. In July 2009, Aribex decided not to license the Asserted Patents but insisted that Dexcowin stop selling the products.

These settlement negotiations plainly fall within the scope of FRE 408. The allegations of infringement were about the Asserted Patents, and the May 2009 communications were attempts to compromise the claim for valuable consideration (i.e. a license). Dexcowin aims to use the May 2009 proposal to argue that Aribex is not entitled to a royalty rate in excess of the proposal; the Court already rejected this argument in denying summary judgment on damages. FRE 408 applies regardless of any probative value of this proposal.

The May 2009 proposal should also be excluded under 402. Federal Circuit law establishes that license agreements that arise under the threat of litigation have little relevance to the hypothetical reasonable royalty situation.

[*Reply:*] It was not a potential legal dispute, but an actual one. The correspondence warned against *continued* sales, indicating that Aribex had reason to believe Dexcowin

had already begun selling/importing its products.  When Aribex declined to license, Dexcowin sought advice of patent counsel and intended to resolve the dispute over infringement accusations.  There was an actual dispute: the February 2009 cease-and-desist letter raised infringement claims and the subsequent discussion over a license was to avoid the legal dispute.

### 2.5.2   *Summary of Plaintiff's Opposition* (Dkt. No. 231)

The May 2009 proposal was the result of a discussion for a joint business proposal before Dexcowin entered the U.S. market to avoid any potential legal conflict.  Contrary to Aribex's contention, it was not under threat of litigation but a business discussion.  There was no disputed claim because it only alleges that should Dexcowin sell its products, such conduct *might* constitute infringement.  Ultimately, no deal was reached in 2009.  Aribex's 402 argument simply repackages the same 408 argument: that the evidence cannot be relevant because it is a settlement offer.

### 2.5.3   *Tentative Ruling*: **DENY**

The documents are not settlement offers because there was no disputed claim at the time.

## 2.6     **Defendant's MIL #6 to preclude evidence of wealth**

### 2.6.1   *Summary of Defendant's Motion and Reply* (Dkt. No. 182, 250)

The size, wealth, and overall revenues of Aribex or its affiliate Danaher are irrelevant, but Dexcowin's conduct during discovery indicates it may use this to sway the jury's sympathy.  Under FRCP 403, any probative value of this evidence is substantially outweighed by unfair prejudice, confusion of issues, and misleading the jury.

[*Reply*:] Even if the evidence is relevant to injunctive relief, that is an equitable remedy before the Court, not the jury. None of the calculations by experts or fact witnesses require evidence of wealth.

### 2.6.2   *Summary of Plaintiff's Opposition* (Dkt. No. 232)

Size, wealth, revenues, and corporate relationship with Danaher are relevant to refute Aribex's claims and defenses: lost profits and the parties' relative bargaining positions in a hypothetical negotiation.  Aribex's opposition to MSJ on inequitable conduct and damages relies on its witness Kappler who discusses the company's market share.  Aribex shouldn't be allowed to cherrypick evidence by including market share but not the size, wealth, and revenue.  They are also relevant for Aribex's claim of injunctive relief for the balance of hardship element.

### 2.6.3  *Tentative Ruling*: **GRANT**

FRE 401,403 size, wealth, and overall revenues of Aribex and of Danaher are irrelevant to the patent issues.  Dexcowin claims that these are relevant for the bargaining positions in a hypothetical negotiation, but its damages expert Blum does not use this in his analysis.  Blum references Danaher in his *Panduit* factor 3 (manufacturing or marketing capacity) analysis, but not its size/wealth/revenue. Dkt. No. 214-2 at 18-19, 70.

## 2.7  **Defendant's MIL #7 to exclude opinions and testimony of Dexcowin damages expert Philip Blum under <u>Daubert</u>**

### 2.7.1  *Summary of Defendant's Motion and Reply* (Dkt. No. 214, 252)

Aribex seeks to exclude Philip Blum from testifying on a reasonable royalty and on the first *Panduit* factor.  His career as a CPA has been focused on the auditing and fraud detection of royalties paid under IP licenses, but his experience as a patent damages expert is recent and limited.

Blum relies on the May 2009 proposal to conclude that a reasonable royalty should be 2% or $50/unit.  He uses the May 2009 term sheet to calculate a 6% starting point. Dexcowin rejected that offer as too high, so Blum arbitrarily set it at 4%.  Because Dexcowin claimed to develop a portable x-ray device with an external battery for $10,000, Blum concludes that Dexcowin wouldn't pay even 4%.  However, the May 2009 proposal did not result in an agreement and Aribex decided not to license the patents.  Blum considered the May 2009 proposal as the most probative evidence of a hypothetical negotiation, but the Court rejected a similar argument when ruling on the MSJ.  The Court noted that the offer was incomplete and unilateral with many variables for a complex joint development deal.  Blum did not account for the differences between such a complex agreement and a bare license or explain why they were economically comparable.

Blum's analysis of *Panduit* factor 1 is fatally flawed because he assumed that Aribex must establish that the NOMAD line or Accused Products were purchased entirely or predominantly because of particular features of the Asserted Patents, as opposed to or in addition to other reasons.  In denying Dexcowin's MSJ on damages, it pointed out that the patentee must show demand for the patented product, not the patented features.  His misapplication of the law should preclude him from testifying to this factor.

[*Reply:*] Dexcowin fails to explain why Blum can base his entire opinion on a single 2009 offer. It argues that he used emails talking about the offer as well, but this does not address the fact that Blum began his analysis by accepting the offer as the most probative evidence and then walk that rate downward through the *Georgia-Pacific* factors to his ultimate and arbitrary 2% royalty.  A damages expert cannot start with inadequate evidence and save it by laundering it through the *Georgia-Pacific* factors.

17

Dexcowin ignores the Court's MSJ order in which it rejected Dexcowin's argument that *Panduit* factor 1 requires demand of the patented feature. Blum cannot justifiably rely on the accounting practice guide to tell him how to apply the factors because it is a question of law.

### 2.7.2   *Summary of Plaintiff's Opposition* (Dkt. No. 233)

Blum's reasonable royalty analysis is not arbitrary; his expert report provides 40 pages of painstaking analysis of the *Georgia-Pacific* factors. A jury can decide whether or not the 2009 offer is the most probative evidence of a reasonable royalty in this case. In 2009, Turner had said that a 5% royalty rate was a reasonable rate and term; this express admission shows that Blum can rely on the offer to rebut Aribex's damages expert.

Aribex offers no basis for excluding Blum's *Panduit* factor 1 analysis. Patentees cannot calculate lost profits based on sales of the entire product (as opposed to the smallest salable patent-practicing unit) without showing that the demand for the entire product is attributable to the patented feature. On this basis, Blum opines that *Panduit* factor 1 requires specific evidence of customer demand and a link between that demand and the specific patented features. His testimony is consistent with relevant accounting literature and practice in calculating patent damages.

### 2.7.3   *Tentative Ruling*: **GRANT**

Dexcowin fails to explain why/how Blum adequately explains that the complex deal is economically comparable to a bare license. Blum's report notes that there are other provisions, but he does not explain the effect of these provisions on the royalty rate in that agreement. Dkt. No. 214-2 at ¶356-359. He simply notes that "nothing on the face of the term sheet indicates that the terms and conditions that Aribex offered for the license of the Patents-in-Suit would have been significantly different had the negotiation been solely for a license." Dkt. No. 214-2 at ¶335. This is conclusory and devoid of analysis applying reliable methods or principles, and his opinion should be excluded as unreliable. A jury could find that the May 2009 proposal is 'the most probative evidence,' but it cannot use it to decide the reasonable royalty without reliable expert testimony to guide it.

*Panduit* factor 1: Dexcowin cites authority which requires the patentee to show that the demand is attributable to the patented feature when elements of a multi-component product are accused of infringement. But because the Asserted Patents cover an entire product, the patentee must only show demand for the patented product. Blum's analysis of *Panduit* factor 1 misapplies the law.

## 2.8   **Defendant's MIL #8 to exclude battery recall**

### 2.8.1   *Summary of Defendant's Motion and Reply* (Dkt. No. 183, 245)

18

Dexcowin claims that the battery recall is relevant to the lost profit analysis, but this is false. The recall was minimal and only affected products already sold.  Also, many of Aribex's portable handheld x-ray devices were available during Aribex's brief stop-ship to satisfy Dexcowin customers' demand in the but-for market, under *Panduit* factor 3. Evidence of battery recall is irrelevant and any probative value is outweighed by confusion of jury and unfair prejudice.  A jury is likely to decide the case based on which of the competing products it would feel safer having used rather than on the merits.

[*Reply:*] Aribex does not object to evidence of the stop-ship order or of when the NOMAD was on the market.  Rather, Aribex objects to tangential matters such as the FDA documents relating to the battery recall, pictures of burnt batteries or units, or otherwise discussing the reason for the recall.  These are all irrelevant to the question of the effect of the recall on the supply of Aribex products on a given date.

### 2.8.2   *Summary of Plaintiff's Opposition* (Dkt. No. 234)

The recall is relevant to *Panduit* factor 3 (manufacturing and marketing capability of exploit demand).  Dexcowin's expert Blum says that if there was no manufacturing and no ability to realize sales during the recall, that period should be factored out of the lost profit calculation.  It's also relevant to *Panduit* factor 4 (amount of lost profits) because any sales subsequent to the recall should be excluded from lost profit calculation if Aribex halted sales during this time period.  Aribex's expert Mahla does not account for this.  If Aribex could not sell its products, Dexcowin could not have been the cause of those lost sales during that time.  Aribex does not offer evidence for its claim [that no lost sales or profits would have been caused by the recall because (1) the recall was minimal and only affected products already sold, (2) ample Aribex portable handheld devices were available during the stop-ship.]

### 2.8.3   *Tentative Ruling*: **GRANT IN PART**

The parties can discuss the effect of the battery recall on the lost profits analysis. FDA documents relating to the battery recall, pictures of burnt batteries, and the reason for the battery recall are excluded because the probative value is substantially outweighed by unfair prejudice and misleading the jury.

## 2.9   **Defendant's MIL #9 to preclude Warren S. Grundfest on Certain Invalidity and Noninfringement Issues**

### 2.9.1   *Summary of Defendant's Motion* (Dkt. No. 215)

Grundfest should not be permitted to testify as to matters in ¶197 of his report or that the IMS1000, IMS2000 or any Dexcowin product/application provide evidence of

obviousness or simultaneous invention. He summarily states that "Dexcowin independently developed two battery-powered x-ray devices before or simultaneously with Aribex's development of its alleged inventions." From this, he concludes that the "claimed apparatus was the product only of ordinary mechanical or engineering skill." However, Grundfest does not identify the specific devices, the characteristics of the devices, or the evidence of their development dates. He does not identify each claim element, state his interpretation of it, and explain in detail how each claim element is disclosed in the prior art reference.

Grundfest should not be permitted to testify as to matters in ¶198 of his report. His opinions on anticipation and obviousness are conclusory and assume that IMS2000 is prior art (*e.g.* "To the extent that IMS2000 is prior art to '178 patent, it anticipates claims 1, 4, 19, and 21 when combined with…"). He does not perform any analysis. He also assumes that Dexcowin would prove that IMS2000 is prior art, but Dexcowin has abandoned such a claim.

Grundfest should not be permitted to testify as to matters in ¶199 of his report because of incorrect factual assumptions. He assumes that the DX3000 is prior art and therefore that it anticipates the Asserted Patents. However, the DX3000 is not prior art because it would have had to have been sold more than one year prior to filing of the Asserted Patents. Even disregarding Aribex's provisional application, the priority date of the '178 patent is at least as early as February 18, 2005 and of the '769 patent as March 21, 2005. Grundfest alleges that the DX3000 was sold in Korea in 2005 but does not allege that it was sold in the U.S. before the critical date.

Grundfest should not be permitted from testifying that Dexcowin's Patent Cooperation Treaty ("PCT") application or its related Korean priority application as prior art or as evidence of independent, simultaneous invention. The PCT application was filed December 7, 2005, after the latest possible priority date of either of the Asserted Patents. Further, the Korean patent application is not effective as prior art before it is published.

Grundfest should be precluded from testifying that any prior art meets the "high current load sufficient for radiographic imaging" if it does not refer to or did not have an x-ray tube greater than 1 mA. "High current load" has been construed to explicitly exclude tube currents of 1 mA or less, so references with current equal to or less than 1 mA or unknown current are not prior art.

Grundfest should be precluded from testifying that the '178 patent is prior art to the '769 patent because the sole inventor of both patents is Clark Turner.

The Court has already determined terms to be definite, so Grundfest should not be permitted to testify otherwise.

### 2.9.2   *Summary of Plaintiff's Opposition* (Dkt. No. 235)

Dr. Grundfest should not be precluded from testifying as to simultaneous or near simultaneous invention. First, by asserting that the DX3000 infringes its patents, Aribex itself alleges that the DX3000 contains each element of the asserted claims. Second, Dr.

Grundfest's reports states that the DX 3000 version in question was created in 2005, and discusses certain features of this device. The creator of the 2005 DX3000, Mr. Lee, will also testify at trial. A jury could reasonably infer that the 2005 DX3000 device contained the same features as the accused DX3000 devices, absent evidence to the contrary. Further, even if the DX3000 or the IMS2000 lacked one or more required elements of certain claims, they would still have probative value in showing that during the relevant time frame, there existed in the relevant art a motivation to combine the elements found in the devices. Moreover, Aribex cites no Federal Circuit authority holding that a contemporaneously-developed device is irrelevant if it lacks a claim element.

Contrary to Aribex's argument that Dr. Grundfest does not perform any analysis regarding the IMS2000, he identifies the features of the IMS2000 and the combinations that render specific '769 claim groups obvious. The IMS2000 has additional probative value and will be admitted as evidence of the state of the art in the relevant time period and as evidence showing a motivation to combine various claim elements at issue. Dexcowin will also show that the IMS2000 does qualify as prior art (argued in MIL #1 & #2). Further, Aribex's argument that DX3000 is not prior art is a matter of summary judgment, which cannot be argued in a MIL. Moreover, Aribex's arguments regarding the invention dates of the patents-in-suit are misleading. The '575 provisional application cannot establish an invention date for either patent because it lacks a written description. The provisional application to the '769 patent also fails to establish an invention date because it was filed more than one year after the application leading to the '769 patent (35 U.S.C. §119(e)(1) requires filing no later than 12 months after provisional).

Dexcowin's Memorandum of Contentions of Fact and Law does not purport to set forth an exhaustive list of the prior art references Dexcowin relies on, so Aribex is incorrect that Dexcowin has abandoned the PCT application as prior art. Aribex's contention that the PCT application is not prior art is a matter of summary judgment and is, therefore, impermissible at this stage. Aribex is also incorrect about the law concerning the priority date of the PCT application. The Patent Act states a PCT application designating the United States will be treated like a U.S. filing, and can claim a priority date based on a foreign filing that took place less than twelve months before the PCT filing. Dexcowin's PCT Application claims priority from Dexcowin's Korean patent application. The Korean patent application was filed on December 14, 2004 – less than 12 months before the PCT filing – and designates the United States.

Dr. Grundfest should not be precluded from relying on prior art references that include a tube current of 1 milliamp because this was within the claim construction for the term "high current load" in effect at the time of his expert report. Dexcowin has also filed a motion for reconsideration to the claim construction order to which Aribex has replied. A change in a key claim construction should not moot significant portions of Dr. Grundfest's invalidity opinion without Dr. Grundfest being affronted an opportunity to revise his report in light of this new claim construction. Once the term "high current load" is finally settled, Dr. Grundfest will file a Supplemental Expert Report taking into account the final term construction. Additionally, the Court's ruling on the high current

21

load precludes infringement by a current not greater than about 2 milliamps, but does not necessarily preclude obviousness. Aribex has effectively admitted that the modification of a 1 milliamp device to use 2 milliamps is obvious.

While Aribex concedes that the '178 patent can be prior art to the '769 patent if "inventorship of the two patents is different," it then asserts that inventorship cannot be different because Dexcowin has purportedly conceded that Sean Turner cannot be a co-inventor of the '769 patent. Dexcowin has never taken the position that it believes Clark Turner is the sole inventor of both patents. Instead, Dexcowin's consistent position has always been, and remains, that Sean Turner is a co-inventor of the '769 patent. Dr. Grundfest should be permitted to offer this opinion at trial.

Aribex's argument that Dr. Grundfest should be precluded from offering nay indefiniteness opinions at trial is wrong for two reasons. First, Aribex never moved for summary judgment with respect to any indefiniteness arguments, and the Court's Order does not purport to grant summary judgment with respect to any indefiniteness arguments. Second, Dexcowin's indefiniteness arguments concerning the terms "low voltage" and "power ranging from about 20 to 50 kV" were never even mentioned in the summary judgment briefing, because Dexcowin did not seek summary judgment with respect to those terms and they do not appear in the claims asserted in the summary judgment motions.

### 2.9.3  *Summary of Defendant's Reply* (Dkt. No. 246)

Dr. Grundfest should not be allowed to testify regarding simultaneous invention. His testimony (that even if the IMS2000 and the 2005 version of the DX3000 did not meet the elements of any claim of Aribex's patents is still probative of the state of the art in the relevant time period) is still inaccurate because it can only be probative of an incomplete portion of the claimed invention, which is impermissible under the law. Also, Dexcowin has provided no authority suggesting anything less than an expert's claim-by-claim analysis is required to prove that a prior art or simultaneous invention is covered by a claim. Further, it is not "absurd" for Aribex to claim infringement over the version of the DX3000 sold today, while insisting Dexcowin prove that the 2005 version was also covered by the claims, given that there is evidence from Dr. Grundfest himself that changes were made to the DX3000 for at least the past 6 years despite the model number remaining the same. Also, Dexcowin suggests that a jury could reasonably infer that the 2005 DX3000 contained the same features as the present devices, however, this conclusion would be erroneous considering it is undisputed that the devices are not the same. Invalidity is an affirmative defense, therefore, the burden is on Dexcowin, not Aribex, to show that the 2005 device is the same as the one sold today. Dr. Grundfest has provided no evidence that the 2005 device actually contained all of the features that he assumes were in it; therefore, his conclusion that the 2005 device met all of the limitations of at least one claim has no reliable foundation. It is too late for Dexcowin to promise to present "ample evidence" in support of the claim-by-claim analysis because it failed to do so in its expert report.

The Court should preclude Dr. Grundfest from testifying on the IMS2000 because his testimony does not rest on reliable facts.  Rather than analyzing the device, Dr. Grunfest assumes that the IMS2000 was portable, handheld, and battery-operated in his testimony.  Dr. Grundfest also does not specify whether the battery in the IMS2000 was internal, which is an element of every claim in each of the Patents-in-Suit. Further, the IMS2000, a 1 mA device, cannot be covered by the '178 Patent because every claim of that patent requires a "high current load," which the Court has found not to include 1 mA devices.  The IMS2000 also cannot be covered by the '769 Patent because it employs a membrane-button "keyboard" and discreet LED light, not an LCD screen as required by every claim of the '769 Patent.  As such, Dr. Grundfest's conclusion that the IMS2000 anticipates claims 1, 4, 19, and 21 of the '178 Patent has no reliable basis. Further, Dexcowin admits that the IMS2000 product by itself does not qualify as prior art under the statute, but tries to fill that gap by promising that it will prove certain manuals, marketing materials, and advertisements that Dexcowin were published early enough to constitute prior art.  However, Dr. Grundfest cannot testify about those items because he did not include analysis of them in his expert report.  Nor can Mr. Lee, a non-expert witness, testify about whether the documents meet the elements of the claim. Thus, Dexcowin has no witness who can properly be permitted to compare the patent claims to the manuals and advertisements at trial.  Lastly, it would be confusing to the jury to let Dexcowin use the IMS2000 as evidence of some undefined "state of the art in the relevant time period."  It is unlikely that the jury will be able to distinguish between prior art and a device that (1) was developed in the wrong country to qualify as prior art under U.S. law, and (2) has some, but not all, of the claim elements.

The Court should preclude Dr. Grundfest from testifying on the DX3000 as prior art.  Aribex does not need to link the '769 Patent, which was filed on March 21, 2005, to the '575 Provisional Application to preclude the DX3000 from qualifying as prior art. The most Dexcowin can say about the 2005 version of the DX3000 is that it was first offered for sale outside the U.S. on an unspecified date in 2005.  Taken as true, this would still not qualify the DX3000 as prior art because it was offered for sale in a foreign country, however, § 102 required that it was known or used in the U.S.  Therefore, the DX3000 is not prior art and Dr. Grundfest should not be able to testify otherwise.

PCT and Korean priority application cannot be used as prior art or evidence of independent, simultaneous invention. 35 U.S.C. 119(a) refers to the use of foreign priority only to overcome a prior art reference by pre-dating it, not to defeat patentability by advancing the effective date of a prior art reference.  That is, 119(a) is a patent-preserving, not patent-defeating, provision.  If Dexcowin's application were pending, it could use the Korean priority date to support patentability by predating some other reference.  It cannot use to defeat patentability of Aribex's patents.  Aribex could not have moved for summary judgment on this issue when it could not have predicted that Dexcowin would attempt to contradict well-established law.

Grundfest can testify about the 'high current load' terms, but he should be precluded from testifying that this element is present under Kobayashi (1 mA) or Yu (silent) references or the Kevex (0.1 mA) or Golden (unknown) devices.  Aribex argued

unsuccessfully that the term should encompass both 1mA and 2mA, not that it is obvious to modify a 1mA device to use 2mA.

The Court should preclude Dr. Grundfest from testifying that the 178' patent is prior art to the '769 patent.  It is irrelevant whether Sean is a co-inventor of the '769 patent because if he is, then he is also a co-inventor of the '769 patent, since the only element that Dexcowin claims Sean came up with – the radiographic display screen – is an element that is present in at least one claim of each patent.

Lastly, the Court should preclude Dr. Grundfest from testifying that any claim element in the Patents-in-Suit is indefinite because indefiniteness is a matter of law, not fact, and the Court has already ruled that all challenged temrs are definite. It makes no difference whether this ruling was part of a denial or a grant of summary judgement, the ruling still stands.  To the extent that Dr. Grundfest now wants to testify that other terms are indefinite, he cannot allowed to do so, because he did not include in his report an indefiniteness analysis of any other terms.

### 2.9.4   *Tentative Ruling*: **GRANT IN PART**

Grundfest may not testify on simultaneous invention.  A simultaneous invention must contain every element or limitation of at least one claim in the asserted patent. Grundfest fails to provide claim-by-claim analysis that shows the IMS2000 or 2005 DX3000 contained all the limitations of at least one of the claims in any of the patents-in-suit.  Mr. Lee is a layperson who may not testify as to the claim elements, and, cannot fill this gap. Regarding the simultaneous invention issue, the current allegedly DX3000 has undergone changes from the 2005 DX3000 device.  Therefore, Aribex's accusation that the current DX3000 infringes upon the patents-in-suit cannot substitute for the lack of claim-by-claim analysis between the 2005 DX3000 and the limitations of the asserted patents.  Grundfest's expert report does not rely on sufficient facts to establish that the IMS2000 and DX3000 are prior art, and therefore, does not satisfy the *Daubert* standard.

Dexcowin's PCT Application and its Korean patent application are not prior art or evidence of simultaneous invention.  The Patent Act (under §§119(a), 365(b)) allows Dexcowin to use these materials to overcome prior art for its US patent application, but they cannot be used as patent-defeating prior art (§102(g)) because they fail to satisfy the 'in this country' limitation.

Grundfest may not testify that the Kobayashi, Yu, Kevex or Golden references meet the 'high current load' claim limitation.  However, he may testify as to the facts that these devices have a given current.  Subject to FRE 702, he may testify that these references render particular claims of the Asserted Patents obvious.

Grundfest may not testify that the '178 is prior art to the '769 patent because Sean is either a co-inventor in both patents or neither, therefore, the inventorship of the patents is the same.

In its summary judgment opinion, this Court ruled that the claims were definite, therefore, Grundfest will be precluded from introducing evidence to the contrary.

## 3   SUMMARY OF TENTATIVE RULINGS

### 3.1   Plaintiff's MILs

- MIL1: (Dkt. 184) to preclude Aribex from offering irrelevant, confusing, and prejudicial evidence or testimony: **GRANT IN PART**
- MIL2: (Dkt. 186) to preclude Aribex from offering the testimony of Scott Hadden: **DENY**
- MIL3: (Dkt. 187) to preclude Aribex from offering the testimony of Martin Hillman: **DENY**
- MIL4: (Dkt. 207) to exclude certain damages testimony of Dr. Charles Mahla: **DENY**
- MIL5: (Dkt. 208) to exclude the expert testimony of Dr. Steven Smith: **DENY**

### 3.2   Defendant's MILs

- MIL1: (Dkt. 176) to exclude Lee testimony: **DENY**
- MIL2: (Dkt. 177) to exclude IMS2000: **DENY**
- MIL3: (Dkt. 178) to exclude testimony of Archer and Bigler: **DENY**
- MIL4: (Dkt. 179) to preclude Brian Min: **DENY**
- MIL5: (Dkt. 212) to exclude evidence of Aribex Settlement Offers Under Rules 402 and 408: **DENY**
- MIL6: (Dkt. 182) to preclude evidence of wealth: **GRANT**
- MIL7: (Dkt. 185, 214) to exclude opinions and testimony of Dexcowin damages expert Philip Blum under Daubert: **GRANT**
- MIL8: (Dkt. 183) to exclude battery recall: **GRANT IN PART**
- MIL9: (Dkt. 193, 215) to preclude Warren S. Grundfest on certain invalidity and noninfringement issues: **GRANT IN PART**